**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LASONYA CAVETT WILLIAMS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:18-CV-1913-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Lasonya Cavett Williams (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1; 16.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

On February 5, 2015, Plaintiff filed her application for DIB, alleging disability beginning on March 27, 2014. (*Id.* at 54.)[2] Her claim was denied initially on May 20, 2015, and upon reconsideration on September 27, 2015. (*Id.* at 77, 82.) On September 28, 2015, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 85-86.) She appeared and testified at a hearing on May 30, 2017. (*Id.* at 32-53.) On August 28, 2017, the ALJ issued a decision finding her not disabled and denying her claim for benefits. (*Id.* at 14-31.)

---

[1]By consent of the parties and order filed October 4, 2018 (doc. 14), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on September 21, 2017. (*Id.* at 155-56.) The Appeals Council denied her request for review on June 22, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-11.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A. Age, Education, and Work Experience

Plaintiff was born on July 28, 1974, and was 42 years old at the time of the hearing. (doc. 12-1 at 35.) She had an eleventh grade education, could communicate in English, and had past relevant work as a school bus driver. (*Id.* at 36.)

## B. Medical Evidence

On March 27, 2014, Plaintiff presented to Stanley B. Cohen, M.D., with musculoskeletal complaints. (*Id.* at 339.) She had pain in her left thigh with numbness and tingling all the way down her left leg that bothered her while driving a bus and sitting for a long period. (*Id.*) A rheumatologist had seen her and felt that she had fibromyalgia and possibly lupus. (*Id.*) Her physical examination showed no evidence of synovitis, but she had severe valgum deformity in her knees. (*Id.* at 341.) Straight leg raising was positive on the left, but Plaintiff had a range of motion that was good in all upper extremity joints, normal in the cervical spine, and excellent in both hips. (*Id.*) She had a positive Taber Patrick maneuver, and her lower extremities were unremarkable. (*Id.*) Dr. Cohen assessed her joint pain as potentially a component of sciatica and recommended imaging studies of her spine, left hip, and knees. (*Id.*) He noted that her lupus was stable with creatinine, and that he had discussed the necessity of weight reduction. (*Id.*) He was uncertain whether Plaintiff could continue working as a bus driver because of her obesity and "mechanical issues." (*Id.*)

The following day, Plaintiff presented to Maria Carmin Perez, M.D., for lupus treatment.

(*Id.* at 300.)  Her creatinine was stable, and she had been tolerating her lupus medication.  (*Id.*)  She continued to experience left leg pain, but her hyperkaimenia, recurrent skin abscesses, and abdominal pain were noted as resolved. (*Id.* at 303.)  She weighed approximately 287 pounds[3] with a BMI of 56.08, and Dr. Perez discussed weight loss strategies. (*Id.* at 303-04.)

On April 1, 2014, Plaintiff underwent MRIs of her lumbar spine and left hip to rule out nerve entrapment and avascular necrosis (AVN). (*Id.* at 341.)  Her lumbar spine showed a 1.8 mm central protrusion with epidural lipomatosis and mild facet hypertrophy at L5-S1, but no significant foraminal narrowing. (*Id.* at 357.)  It also showed minor degenerative disc disease (DDD) and epidural lipomatosis, but was not considered significant by the examining neurologist.  (*Id.* at 333.)  Bilateral lower quadrant/pelvic cystic lesions were observed, and a sonographic correlation was recommended for possible adnexal tumors. (*Id.* at 358-59.)  Plaintiff's left hip showed bilateral symmetric avascular nacrosis of the femoral heads without articular surface collapse or disruption, as well as mild left gluteus minimus and medius insertional tendinopathy. (*Id.* at 359.)  It also showed borderline bilateral external iliac symmetric lymphadenophy, and a correlation for systemic cause was recommended. (*Id.*)  A septated left adnexal cystic focus measuring at least 4.2 x 4 cm was observed, and the radiologist opined that stability of this finding could be confirmed through a follow-up pelvic ultrasound. (*Id.*).  A right knee X-ray was unremarkable. (*Id.* at 356.)

On May 20, 2014, Plaintiff returned to Dr. Cohen for pain in both her lower back and lumbosacral junction.  (*Id.* at 333.)  She weighed approximately 283 pounds with a BMI of 52.60. (*Id.* at 335.) Dr. Cohen recommended physical therapy and continued weight reduction, and referred her for pain management. (*Id.* at 336.)  He noted that she should remain on short-term disability

---

[3]Plaintiff's actual weight was 130.26 kilograms. (*See* doc. 12-1 at 304.)

because her situation prevented her from working as a bus driver. (*Id.*) On May 28, 2014, Plaintiff's hip X-ray showed mild degenerative changes of the right hip, and her pelvic ultrasound was normal. (*Id.* at 353-54.)

From June 2014 through September 2014, Plaintiff completed eleven physical therapy sessions for sacroilitis, trochanteric bursitis, and lumbar radiculopathy. (*Id.* at 266-67.) Her compliance with physical therapy was noted as "fair"; she discharged herself on September 29, 2014. (*Id.*)

On July 3, 2014, Plaintiff saw Dr. Cohen for a follow-up. (*Id.* at 327.) She weighed 277 pounds with a BMI of 51.49. (*Id.* at 329-30.) She had responded well to epidural steroid injections, and Dr. Cohen opined that the source of her pain appeared to be from her hips and back. (*Id.* at 329.) Her lupus nephritis (LN) and aseptic necrosis femur (ANF) symptoms were noted as stable, and the results from her musculoskeletal examination remained unchanged. (*Id.* at 329-30.) Dr. Cohen opined that she should not drive a bus and would be better off in a sedentary job. (*Id.* at 327.)

On August 18, 2014, Plaintiff returned to Dr. Perez for a lupus follow-up.(*Id.* at 287.) Her renal function and creatinine remained stable, but she continued showing proteinuria and hematuria. (*Id.*) She weighed approximately 273 pounds with a BMI of 53.47. (*Id.* at 288.)

At a follow-up with Dr. Cohen on September 2, 2014, Plaintiff reported lower back pain during prolonged sitting or weight bearing. (*Id.* at 406.) Prior injections provided some relief, but her symptoms returned. (*Id.*) She did not have any radicular complaints or hip issues, and her weight remained the same. (*Id.*) Dr. Cohen noted that her DDD was being aggravated by her obesity and severe lumbar lordosis, and recommended core strengthening, another injection, and aggressive weight reduction. (*Id.* at 409.)

The following day, Plaintiff presented to Irving Orthopedics and Sports Med (Orthopedics) for evaluation of her bilateral hips. (*Id.* at 271.) Her bilateral hip pain had started gradually months before, was most severe in the left hip, and would radiate to the lower leg. (*Id.*) She described it as constant "sharp, aching, and numbness of moderate intensity" that would become more severe with standing and sitting. (*Id.*) She previously received two left sacroiliac joint injections that had moderately improved her pain, and she was administered another injection. (*Id.*)

On September 25, 2014, she returned to Orthopedics with "throbbing" pain in her low back and left leg that she rated as an eight out of ten, worse than in her previous visit. (*Id.* at 268.) It was noted that her recent cortisone injection was "not effective," her lumbosacral spine range of motion was "mildly reduced," and her straight leg raise test was positive on the left. (*Id.* at 268, 270.) She agreed to the recommended lumbar medical branch block injection under fluoroscopy to relieve pain. (*Id.* at 270.)

On November 25, 2014, Plaintiff saw Dr. Cohen for a routine appointment. (*Id.* at 317.) She had been in a motor vehicle accident earlier in the month that had aggravated the pain in her cervical and lumbar spine. (*Id.*) She weighed approximately 266 pounds with a BMI of 49.44. (*Id.* 317-19.) She denied photosensitivity and did not have eye pain or changes in vision, but reported some episodic paresthesia in her hands that worsened after lying down. (*Id.* at 317.) Dr. Cohen released Plaintiff back to work despite her being symptomatic, but she stated that she was unable to continue in her current position and would be looking for alternative employment. (*Id.* at 319.) Plaintiff returned to Dr. Cohen on December 2, 2014; her ANF was considered stable and she was not experiencing significant discomfort. (*Id.* at 312-14.)

On February 6, 2015, Plaintiff saw Dr. Perez for her lupus. (*Id.* at 279.) She continued

showing proteinura and hematuria, and reported that she had not been to pain management and was no longer working. (*Id.* at 280.)

On May 18, 2015, Roberta Herman, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical records as part of her disability determination. (*Id.* at 54.) She identified Plaintiff's medically determinable impairments as DDD and systemic lupus erythematosus (SLE), but noted that a consultative examination was not required. (*Id.* at 56.) While partially credible, she found that "the statements made by the claimant regarding symptom-related functional limitations and restrictions cannot reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." (*Id.* at 56-57.) She assessed Plaintiff as having the physical residual functional capacity (RFC) to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 2 hours, and sit for 6 hours in an 8-hour workday. (*Id.* at 57-58.) She identified no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 58.) Dr. Herman found that Plaintiff was not disabled, and her RFC demonstrated the maximum sustained work capability for sedentary work. (*Id.* at 59-60.) Amita Hedge, M.D., reviewed and affirmed Dr. Herman's assessment on August 19, 2015. (*Id.* at 62-69.)

On September 14, 2015, Plaintiff saw Dr. Perez for a routine appointment. (*Id.* at 466.) She continued showing proteinuria and hematuria, and was still experiencing joint pain. (*Id.* at 467.) She was off steroids and had been unable to see Dr. Cohen for her SLE because she did not have insurance. (*Id.*) She weighed approximately 252 pounds[4] with a BMI of 49.22; her eyes were normal. (*Id.* 467-68.)

On September 29, 2015, Plaintiff was seen by a physician assistant (PA) at Parkland Hospital

---

[4]Plaintiff's actual weight was 114.3 kilograms. (*See* doc. 12-1 at 658.)

(Parkland).  (*Id.* at 560.)  She reported a "band-like" headache for three days, myalgias (or muscles aches), and tingling in the toes with constant pain.  (*Id.*)  The PA noted that her generalized myalgias were typical to her lupus pain, but she had been out of her lupus medication for 4 months.  (*Id.*)  Plaintiff reported bilateral eye pain with hard red nodules, and that her "eye doctor" advised her to use a warm compress.[5]  (*Id.* at 561.)  She was referred to a primary care physician who would organize a follow-up with a rheumatologist and nephrologist treatment and provide her with her medications.  (*Id.* at 563.)

On November 12, 2015, Plaintiff returned to Parkland to establish care for her SLE and lupus nephritis (LN).  (*Id.* at 589.)  She had recently been diagnosed with Shingles and had a rash that was still painful but less erythematous.  (*Id.*)  She reported occasional sharp stabbing and shooting pains in her bilateral toes that worsened upon standing and walking. (*Id.* at 589.)  She would sit to improve her pain, and had to limit her ibuprofen intake due to her LN.  (*Id.*)  Plaintiff denied any current arthraigias or myalgias, but complained of persistent lower back pain that was exacerbated by activity. (*Id.*)  She weighed approximately 246 pounds with a BMI of 48.3.  (*Id.* at 591.)  The examining physician noted that Plaintiff's SLE and LN was currently a "quiet disease [with] no flare up," and her coronary artery disease (CAD) appeared normal with no signs of clinical heart failure and a normal cardiovascular (CV) exam.  (*Id.* at 592.)  She was advised to lose weight and to continue taking the medication prescribed for her shingles, neuropathic pain, CAD, SLE, LN, and hypertension. (*Id.* at 592-93.)

On January 21, 2016, Plaintiff saw Dr. Perez and reported ankle and back pain, but no arthralgias, joint swelling, or joint stiffness was observed. (*Id.* at 472-74.)   She weighed

---

[5]There was no record of this encounter, nor were there any medical records from an eye doctor.

approximately 256 pounds with a BMI of 50.02. (*Id.* at 474.) She was still unable to see Dr. Cohen due to insurance issues, but stated she would establish care for her SLE with another rheumatologist the following week. (*Id.* at 475.) She was instructed to continue losing weight and to follow a low sodium diet. (*Id.*)

On February 26, 2016, Plaintiff returned to Dr. Perez, complaining of back and arm pain. (*Id.* at 480.) There were no significant changes in her weight and BMI, and her renal function was "stable with same proteinuria." (*Id.*) She did not report any problems with her eyes, and they showed no erythema, swelling, or discharge with equal, round, and active pupils. (*Id.* at 481.) On July 11, 2016, Plaintiff returned to Dr. Perez with back and joint pain and some tingling in her lower extremities. (*Id.* at 488.) Her weight and BMI increased to approximately 266 pounds[6] and 51.95 respectively, but she was noted as being otherwise stable. (*Id.* at 488-89.)

On July 18, 2016, Plaintiff presented to rheumatology at Parkland to establish care for her SLE. (*Id.* at 605.) She reported body aches, pains "jumping all over [her] body," fatigue, and difficulty with getting off the couch and driving, but her kidneys felt unaffected. (*Id.* at 607.) Her eyes were positive for blurry vision and negative for irritation and redness, and she denied photosensitivity or dry eyes. (*Id.* at 607-08.) She once lost eyesight in her right eye in 1998, but the cause was unclear. (*Id.* at 607.) Plaintiff had arthralgias of the shoulders, lower back, and hips, pain in the legs and knees, and some discomfort of the ankles and toes. (*Id.* at 607.) She weighed approximately 263 pounds, and her musculoskeletal examination was unremarkable. (*Id.* at 609.) The examining physician's assessment was "SLE with mildly active disease at present," "Lupus nephritis with CKD stage 3b with currently stable renal function," and fibromyalgia was

---

[6]Plaintiff's actual weight was 120.65 kilograms. (*See* doc. 12-1 at 489.)

"contributing to much of her current symptoms." (*Id.* at 609-10.) Exercise was recommended, and she was referred to ophthalmology for a baseline eye examination. (*Id.* at 610.)

On November 14, 2016, Plaintiff returned to Dr. Perez and was primarily concerned with her weight gain. (*Id.* at 495.) She weighed approximately 262 pounds[7] with a BMI of 51.21. (*Id.* at 499.) Her renal function was noted as stable with minimal proteinuria. (*Id.* at 495.) Dr. Perez found "no erythema, swelling or discharge" of her eyes and noted that the pupils were equal, round and reactive to light. (*Id.* at 496.) It was noted that she had missed her last rheumatology appointment at Parkland. (*Id.*)

On December 12, 2016, Plaintiff went to Parkland for a routine appointment; she weighed approximately 277 pounds. (*Id.* at 616.) She had lower back pain, bilateral hip and ankle pain, and numbness in both arms and legs, and complained that "[p]ain just travel[ed] through [her] body." (*Id.* at 617.) Ibuprofen was no longer effective, and her pain was sometimes so severe that she was unable to even brush the side of her body with a sheet. (*Id.*) She did not know if the cause of pain was fibromyalgia or lupus, but her prior "lupus attacks" had caused her chest pain. (*Id.*) Plaintiff was reportedly unable to be active because she was "in too much pain," but admitted that she drank "a lot of Dr. Pepper and other regular sodas," ate "a lot of fried food," and frequently went out to eat. (*Id.*) The examining physician noted that "sometimes there is no treatment for fibromyalgia despite [] best efforts," and advised her to "work on losing weight" by "cutting down on regular sodas and eat[ing] l less fried meal per week," eating a healthy and balanced diet, and exercising 15 to 30 minutes for 3 to 5 times a week "or as tolerated." (*Id.* at 620, 622.)

On March 7, 2017, Plaintiff returned to Parkland and reported that she hurt her thumb

---

[7]Plaintiff's actual weight was 118.92 kilograms. (*See* doc. 12-1 at 499.)

"playing around." (*Id.* at 633.) She had been diagnosed with a strain and wore a wristband that made her wrist feel better. (*Id.*) She weighed approximately 292 pounds with a BMI of 57.2, was noted to have gained over 30 pounds in less than a year, and was morbidly obese, but "continue[d] to drink regular sodas, eat fried foods, and eat out." (*Id.* at 632-33.) Her lupus nephritis was stable, but her urinary protein/creatinine ratio was elevated. (*Id.* at 635.) Plaintiff reported being told that she had DDD with possible spinal stenosis, but the examining physician observed no radicular symptoms. (*Id.*) She was urged to lose weight, particularly since she had "gained almost 50 lbs in [the] past 2 years." (*Id.*)

On March 14, 2017, Plaintiff presented to rheumatology at Parkland for a follow-up. (*Id.* at 641.) She reported chronic hip, back, and joint pain that she attributed to the deterioration of her hip bone from chronic steroid use. (*Id.* at 642.) It was noted that her "generalized pain [was] secondary to fibromyalgia," and that she should continue taking her prescribed medication for it. (*Id.* at 641.) She weighed approximately 292 pounds, and her musculoskeletal examination showed tenderness and normal range of motion of the upper and lower extremities. (*Id.* at 643-44.) Her eyes were "positive for blurred vision" and "negative for phobophobia," and she was again referred to ophthalmology for a baseline eye examination. (*Id.* at 642, 644.) Her chest X-ray was unremarkable and showed no acute cardiopulmonary disease. (*Id.* at 679.) Her lumbar spine X-ray showed diminutive or absent ribs at T12, and L5 partially sacralized on the left with a pseudarthrosis potentially symptomatic. (*Id.* at 680.) The vertebral body heights were maintained with no subluxation, and there was mild facet arthrosis at multiple levels. (*Id.*)

## C.    Hearing

On May 30, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ.  (*Id.* at 32-53.)  Plaintiff was represented by an attorney. (*Id.* at 34.)

### 1.        Plaintiff's Testimony

Plaintiff testified that she had attended school up to the eleventh grade and was not currently working. (*Id.* at 36-37.)  She had a driver's license and was still able to drive. (*Id.* at 36.)  She weighed 294 pounds and continued seeking medical treatment for lupus. (*Id.* at 36-37.)  She was in constant throbbing pain, primarily in her back, hips, and legs.  (*Id.* at 36, 44.)  She was always tired and spent five or six hours on the couch with her legs elevated. (*Id.* at 43, 46.)  She saw Dr. Perez every three months for kidney treatment, including blood work and medication refills.  (*Id.* at 36.)  Plaintiff had difficulty walking and used a cane at times, but it was not medically prescribed, and she was able to walk or sit for ten minutes at a time without problems.  (*Id.* at 37, 39.)  Because of soreness and aches in her arms, she had trouble lifting and carrying things greater than five to eight pounds.  (*Id.* at 39-40.)

Plaintiff's activities at home included showering, making food, washing dishes, laundry, and other things to avoid getting "stiff."  (*Id.* at 40.)  She also swept and vacuumed, but the activities were  hard on her back.  (*Id.*)  When doing household activities, she had to sit on the couch for ten to fifteen minutes depending on how long she had been working.  (*Id.* at 44.)  Plaintiff went to the grocery store once a month, but used a motorized scooter, and her children helped carry the groceries. (*Id.* at 44-45.)  She was tired and had pain in her hips and back after shopping, and had to sit for at least twenty minutes before putting groceries away. (*Id.* at 45.)  She was able to take her children out to eat, or they would go to her sister, who lived eight minutes away. (*Id.* at 42.)

Plaintiff went to church once or twice a month, and watched television in the evenings. (*Id.*)  When experiencing a "bad day," none of her medication effectively treated her pain, she was unable

to move, and had to lay in bed all day. (*Id.* at 46.) She experienced approximately four "bad days" per week. (*Id.* at 47.) Dr. Cohen had been administering injections for her lupus and avascular necrosis, which provided her "a little relief" for a couple of days, but she had not had any recent injections. (*Id.* at 47.) Plaintiff had been going to Parkland every three months for management of her medications, but "they ha[d]n't ordered anything" with regard to surgical intervention or other treatment options. (*Id.* at 47-48.)

##  2. VE's Testimony

The VE testified that Plaintiff had previous work experience as a school bus driver, which was a semi-skilled position, exertional level medium, but performed light with an SVP of 4. (*Id.* at 49.) A hypothetical person with the same age, education, and work experience history as Plaintiff, who had the ability to carry 20 pounds occasionally and lift and carry 10 pounds frequently, stand and walk alternatively for two hours of each activity out of eight hours per day, sit intermittently throughout the day, reach, push, and pull with upper extremities up to eight hours per day, grasp, hold, and turn objects up to eight hours a day, and alternatively climb, stoop, kneel, crouch, crawl, and balance up to two hours a day, would be able to perform her past work, but it would be "strenuous." (*Id.* at 49-50.) There was other available work that the hypothetical person could perform, including document preparer (light and SVP-2) with 28,000 jobs nationally; food and beverage order clerk (light and SVP-2) with 40,000 jobs nationally; touch up screening (light and SVP-2) with 25,000 jobs nationally, all of which were consistent with the DOT. (*Id.* at 50-51.) If the hypothetical person had unscheduled absences totaling more than three per month, or would be off task for even 20 percent of the workday due to chronic pain and fatigue, she would not be able to maintain and sustain any job in the national economy. (*Id.* at 51.)

**D.    ALJ's Findings**

The ALJ issued a decision denying benefits on August 28, 2017. (*Id.* at 14.)  At step one, he found that Plaintiff met the insured status requirements on December 31, 2016, and had not engaged in substantial gainful activity since the alleged onset date of March 27, 2014.  (*Id.* at 19.) At step two, the ALJ found that she had the following severe impairments: AVN of the left femur; SLE with class III nephritis; CAD status post stent; chronic kidney disease (CKD); diabetes mellitus (DM); and lumbar DDD with sacroiliitis. (*Id.* at 19-20.)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to lift 20 pounds occasionally and lift and carry 10 pounds frequently, to stand and walk alternatively for 2 hours each activity out of 8 hours per day with sitting occurring intermittently throughout the day, to reach, push, and pull with her upper extremities for up to 8 hours per 8-hour day, to use her hands for grasping, holding, and turning objects for up to 8 hours per 8-hour day, and to alternatively climb, stoop, kneel, crouch, crawl, and balance for up to 2 hours each activity per 8-hour day. (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform her past work  (*Id.* at 25.)   At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled, whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.*)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from March 27, 2014, the alleged onset date,

through December 31, 2016, the date last insured. (*Id.* at 27.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.  The ALJ failed to apply the appropriate legal standard established by the Fifth Circuit Court of Appeals in deciding which of Plaintiff's impairments are severe at Step two of the Sequential Analysis.

2.  The ALJ erred by not ordering a consultative examination of the Plaintiff's physical impairments.

3.  The ALJ's RFC is fatally flawed because it is not based on substantial evidence.

(doc. 16 at 1.)

### A.  Severity Standard

Plaintiff first argues that the ALJ failed to apply the appropriate legal standard of "severe" in making the findings at step two. (doc. 16 at 9-14.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments

which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that [his] impairment is severe enough to interfere with her ability to do work." *Anthony* , 954 F.2d at 294 n.5 (citation omitted). "Because a determination [of] whether an impairment[ ] is severe requires an assessment of the functionally limiting effects of an impairment[ ], [all] symptom-related limitations and restrictions must be considered at this step." SSR 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

At the outset of decision, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it *significantly* limits an individual's ability to perform basic work activities." (doc. 12-1 at 18.) (emphasis added). He further stated that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have *no more than* a minimal effect on an individual's ability to work." (*Id.*) (emphasis added). In identifying Plaintiff's severe impairments, the ALJ cited to 20 CFR 404.1520(c)[8], but there were no citations

---

[8]Under 20 CFR 404.1520 for evaluation of disability in general:

You must have a severe impairment. If you do not have any impairment or combination of impairments which *significantly limits* your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period

or references to *Stone*. (*Id.* at 19-20.)

*Stone* provides no allowance for a minimal interference with a claimant's ability to work. *Stone*, 752 F.2d at 1104. Given the difference between these two constructions and the ALJ's failure to cite to *Stone*, it appears he applied an incorrect standard of severity. *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D. Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the definition of severity under 20 C.F.R. § 404.1520(c) that the ALJ cited in this case); *see also Lawson v. Astrue*, No. 4:11-CV-00426, 2013 WL 449298, at *4 (E.D. Tex. Feb.6, 2013) (noting "while the difference between the two statements appears slight, it is clear that the [regulatory definition] is not an express statement of the *Stone* standard").

Even where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's (or its symptoms) effects on the claimant's ability to work at those steps. *See, e.g., Herrera*, 406 F. App'x at 3 & n.2; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). An ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [ ] where the ALJ proceeds past step two in the sequential evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *accord Newbauer v. Colvin*, No. 3:14-CV-3548-BH, 2016 WL

---

of disability for a time in the past even though you do not now have a severe impairment.

20 CFR 404.1520(c) (emphasis added).

1090665, at *15 (N.D. Tex. Mar. 21, 2016) (applying harmless error analysis); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe). Accordingly, Plaintiff must show that the ALJ's step two error was not harmless. *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error."). In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, at step two, the ALJ found that Plaintiff's AVN of the left femur, SLE with class III nephritis, CAD status post stent, CKD, DM, and lumbar DDD with sacroilitis were severe impairments. (doc. 12-1 at 19-20.) He noted that there were indications of non-severe impairments including trochanteric bursitis, hypertension, anemia, recurrent skin abscesses, and obesity. (*Id.* at 20.) He also noted that Plaintiff had been diagnosed with fibromyalgia, but found that it was not an impairment that was medically determinable. (*Id.*) Because none of her impairments or a combination of impairments met or medically equaled a listed impairment at step three, the ALJ proceeded to assess Plaintiff's RFC. (*Id.* at 21); *see also* 20 C.F.R. § 404.1520a(d)(3); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.").

### 1.    Obesity

Plaintiff argues that the *Stone* error was not harmless because her obesity was a severe

impairment that was not considered by the ALJ in the steps of the sequential analysis. (doc. 16 at 12-13.) She contends that "had the ALJ considered Plaintiff's impairments not listed in the ALJ's step 2 finding, including obesity, both singly and in combination with [her] other impairments, the ALJ could have found that [she] is limited to a less than sedentary RFC." (*Id.* at 14.)

"The mere presence of some impairment is not disabling *per se*." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). The disability claimant is required to show that "she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity." *Id.* Obesity itself is not a listed impairment, but it can reduce an individual's occupational base for work activity in combination with other ailments. *See* SSR 02–1p, 2002 WL 34686281, at *3, 6 (S.S.A. Sep. 12, 2002) ("Obesity can cause limitation of function . . . [and an] individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching."). The regulations do not state that "obesity necessarily causes any additional function limitations; rather, it provides obesity can cause such limitations." *Medrano v. Astrue*, No. A-09-CA-584-SS, 2010 WL 2522202, at *5-6 (W.D. Tex. June 17, 2010) (citing SSR 02-1p). The ALJ is not required to find any particular limitations of functions because of a claimant's obesity, but it should be considered in combination with other impairments in discussing the claimant's ability to perform sustained work activities. *See Beck v. Barnhart*, 205 F. App'x 207, 212 (5th Cir. 2006) (citing SSR 02–1p). Nonetheless, there "should be some indication in the administrative applications or medical record itself that a claimant's obesity has caused some level of functional limitation, has exacerbated other existing ailments, or has otherwise affected the claimant." *Robertson v. Berryhill*, No. 2:16-CV-249-J-BR, 2017 WL 6767373, at *6-7 (N.D. Tex.

Dec. 11, 2017), *adopted by* 2018 WL 278674 (N.D. Tex. Jan. 2, 2018).

Here, the ALJ noted that Plaintiff alleged disability due in part to "adipose tissue," and there were indications of obesity in the record, but he found no evidence that her obesity met "the durational requirements of this program and that [it] created more than minimal specific functional limitations regarding [her] ability to perform work related activities." (doc. 12-1 at 20, 22.) In determining Plaintiff's RFC, the ALJ found that she could lift 20 pounds occasionally and lift and carry 10 pounds frequently, stand and walk alternatively for 2 hours each activity out of 8 hours per day with sitting occurring intermittently throughout the day, and reach, push, and pull with her upper extremities for up to 8 hours per 8-hour day. (*Id.* at 21.) Plaintiff could also use her hands for grasping, holding, and turning objects for up to 8 hours per 8-hour day, and could alternatively climb, stoop, kneel, crouch, crawl, and balance for up to 2 hours each activity per 8-hour day. (*Id.*)

Plaintiff argues that the ALJ's RFC does not adequately reflect the limitations caused by her obesity because the SAMC opinions that he adopted for it were "stale" by the time of the hearing. (doc. 16 at 13.) She contends that at the hearing she was 294 pounds, but the medical records considered by the SAMCs documented her weight as 266 pounds. (*Id.*) She also points to her medical records from Parkland, which noted her 30-pound weight increase between August 2015 and March 2017. (*Id.*) While her medical records referenced her obesity, there was no opinion as to any functional limitations due to her obesity, or formal treatment for it. Given her weight, one of her medical providers instructed her to exercise at least 3 to 5 times a week for 15 to 30 minutes, but did not include any physical limitations or restrictions. (*Id.* at 622.)

Neither Plaintiff nor her counsel alleged any limitations due to obesity during the hearing before the ALJ, but she now claims for the first time on appeal that her obesity and weight gain

should have limited her "to a less than sedentary RFC." (doc. 16 at 14.) She fails to cite to any evidence in the record to demonstrate that her obesity exacerbated her other medical impairments however, or that her physicians stated that her obesity imposed additional functional limitations. *See Robertson*, 2017 WL 6767373, at *6-7 (finding no error when the ALJ "did not mention or discuss plaintiff's BMI measurements or discuss plaintiff's qualifying obesity at any level of the sequential evaluation" because "there were no opinions from any medical sources concluding plaintiff had any limitations specifically due to his weight or any evidence or testimony that his weight exacerbated his other impairments, and [no] evidence to show either that additional limitations were warranted due to plaintiff's weight"). Plaintiff has not shown that her obesity was severe enough to interfere with her ability to do work. *See McDaniel v. Colvin*, 4:13-CV-989-O, 2015 WL 1169919, at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments not to be severe because the ALJ considered the relevant evidence in his decision and plaintiff did "not point to any evidence in the record indicating that her alleged obesity or hearing loss caused any work-related limitations beyond those already found by the ALJ"); *see also Vogt v. Astrue*, No. 3:11-CV-315-BH, 2011 WL 5245421, at *11 (N.D. Tex. Nov. 2, 2011) (finding no error when the plaintiff "fail[ed] to cite to any evidence in the record to demonstrate that her obesity exacerbated her other medical impairments")). Further, the ALJ considered the effects of Plaintiff's non-severe impairments in combination with her other severe impairments and included appropriate limitations that were supported by substantial evidence in the record. (*See* doc. 12-1 at 18); *see Goodman v. Comm'r of Soc. Sec.*, No. 3:11-CV-1321-G, 2012 WL 4473136 at *10 (holding that "[e]ven if the ALJ should have recognized narcolepsy as a separate and severe impairment, the . . . error was harmless, as the ALJ considered the effects of a sleep disorder, whether narcolepsy or

sleep apnea, throughout the sequential analysis"). Accordingly, the *Stone* error was harmless, and remand is not required on this issue.

### 2. Vision Impairment

Plaintiff also argues that because the ALJ failed to consider her vision problems at any step of the analysis, "the presumption of legal error is not rebutted in this case." (*Id.*)

As noted, the claimant has the burden of proving her disability, "and the ALJ has a duty to fully develop facts, or else the decision is not supported by substantial evidence. The ALJ's duty to investigate, though, does not extend to possible disabilities that are not alleged by the claimant or to those disabilities that are not clearly indicated on the record." *Leggett*, 67 F.3d at 566. "Consequently, when [the] claimant fails to raise the issue of a particular cause for disability before seeking review in the district court, [she] cannot say that [she] put the issue before the ALJ or that the ALJ improperly disregarded it." *Viltz v. Astrue*, No. 6:10-CV-00231, 2011 WL 4479578, at *6 (W.D. La. Aug. 18, 2011).

In this case, the ALJ found no limitation related to Plaintiff's vision. Her medical records consistently showed no vision difficulties. (doc. 12-1 at 317 (finding no photosensitivity on November 25, 2014); at 467-68 (normal eye examination on September 14, 2015); at 481 (normal eye examination on February 26, 2016); at 496 (normal eye examination on November 14, 2016).) On July 18, 2016, Plaintiff was positive for blurry vision and reported that she lost eyesight in her right eye in 1998, (*id.* at 607-08), and she also reported blurry vision on March 14, 2017, (*id.* at 642). She was instructed to visit ophthalmology for a baseline eye examination on both occasions, but there is no evidence of or reference to an examination in the record. (*Id.* at 612, 642.) Further, although she was provided the opportunity to identify any symptoms or limitations not discussed

at the hearing, she did not mention her vision impairment. (*Id.* at 48.)  Plaintiff points to no evidence

showing that her vision impairment affected her ability to work.   The ALJ's failure to consider

Plaintiff's impaired vision was therefore harmless error that does not merit remand.  *See Sweeten*

*v. Astrue*, No. 3:11-CV-0934-G-BH, 2012 WL 3731081 (N.D. Tex. Aug. 13, 2012) (finding no error

in the ALJ's failure to consider anxiety as a severe impairment where the plaintiff failed to claim

anxiety as an impairment before the ALJ, the medical records showed only an occasional display

of symptoms, and she never sought treatment for anxiety); *cf. Dominigue v. Barnhart*, 388 F.3d 462,

463 (5th Cir. 2004) (per curiam) (affirming the ALJ's conclusion that the claimant's depression "was

no impairment at all[,]" where "[a]t the administrative level [the claimant] did not contend that

depression was an impairment, and, in the courts, she pointed to no evidence indicating that her

alleged depression affected her ability to work.").

**B.    Duty to Develop**

Plaintiff argues that the ALJ erred by not ordering a consultive examination of her physical

impairments. (doc. 16 at 14.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits.

*Newton v Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th

Cir. 1995)).   When the ALJ fails in this duty, he does not have before him sufficient facts upon

which to make an informed decision, and his decision is not supported by substantial evidence.

*Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir.

1984).   For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show

that "(1) the ALJ failed to fulfill [her] duty to develop the record adequately and (2) that failure

prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).   The duty to obtain

medical records generally belongs to the claimant, however. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *7 (N.D. Tex. Mar. 25, 2011).

"The decision to order a consultative examination is within the ALJ's bailiwick." *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006). An ALJ must order a consultative evaluation when it is necessary to enable him to make the disability determination. *See Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam). Isolated comments without further support by a claimant are insufficient to raise a suspicion of non-exertional impairment. *See Pierre v. Sullivan*, 884 F.2d 799, 802-03 (5th Cir. 1989) (per curiam) (holding isolated comments about claimant's low intelligence insufficient to raise suspicion that claimant was mentally retarded); *Brock*, 84 F.3d at 728 (holding the claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, he never sought medical treatment for such impairments, and he did not mention these impairments at his hearing). When evidence in the record supports a conclusion that the claimant is not disabled, a consultative exam is not necessary. *See Turner*, 563 F.2d at 671. Additionally, the duty to develop the record can be effectuated by the ALJ's questioning of the claimant regarding her education, training, past work history, the circumstances of her injury, daily routine, pain, and physical limitations, and providing an opportunity to add anything else to the record. *See Sun v. Colvin*, 793 F.3d 502, 509 (5th Cir. 2015) ("Consistent with that description, the court often focuses on the ALJ's questioning of the claimant in order to determine whether the ALJ gathered the

information necessary to make a disability determination.") (citing *Brock*, 84 F.3d at 728).

Plaintiff argues that the ALJ had a duty to obtain a consultative examination because the extent of her "pain, functional limitations, vision problems and fibromyalgia is not clear from the medical records." (doc. 16 at 15.) She contends that her testimony regarding her limitations, and the progress note from Dr. Cohen that she would be better off pursuing a "sedentary job," raise some suspicion that her impairments caused nonexertional limitations that were not reflected in the RFC. (*Id.*) She also argues that "the ALJ should have ordered a CE to make certain of the limiting effects of her obesity, chronic pain, and other impairments." (*Id.*)

Here, the ALJ considered a medical record that was over 400 pages long and included over 4 years of treatment notes from Plaintiff's treating physicians and the medical records from Parkland. (doc. 12-1 at 266-681.) The record also contained two RFC assessments from non-examining consultants, who both found that consultive examinations were unnecessary. (*Id.* at 54-71.) There is no indication that the medical records before the ALJ were inadequate, or that he lacked sufficient facts to make a determination. *See Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ."). Although the ALJ found that Plaintiff's fibromyalgia diagnosis was not "medically determinable" because it was unsupported by acceptable evidence under SSR 12-2p, there is no indication that the ALJ found the evidence in the record inconclusive or otherwise inadequate to render a decision. (doc. 12-1 at 20.) For example, the ALJ reviewed Dr. Cohen's "sedentary" comment, but determined it was conclusory and unsupported by the medical record. (*Id.* at 24-25.) He found that the term was being used "in its programmatic sense," and the RFC's standing and walking limitation was "consistent with most reasonable understandings of that term." (*Id.* at 25.)

Even if certain aspects of Plaintiff's medical history were not included in the medical record, there is no evidence that she raised the need for an additional consultative examination at the hearing or at any time before the ALJ rendered his decision. Because Plaintiff was represented by counsel at the hearing, no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel). As noted, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. Plaintiff has not demonstrated how additional consultative examinations would have led to a more favorable decision. The ALJ fulfilled his duty to fully and fairly develop the record, and remand is not required on this issue.[26]

## C.    RFC Determination

Plaintiff contends that the RFC is not based on substantial evidence and is therefore fatally flawed. (doc. 16 at 1.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). The relevant policy interpretation states:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained

---

[26]Even if the ALJ should have ordered a consultative examination, Plaintiff has not shown that she was prejudiced in that the additional evidence would have been produced that might have led to a different decision. *See Thompson v. Colvin*, No. 4:12-CV-466-Y, 2013 WL 4035229, at *6 (N.D. Tex. Aug. 8, 2013). Any error was therefore harmless.

> work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.

SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that

he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted). Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff argues that the ALJ improperly relied on his own lay opinion to determine the effects of her impairments in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). (doc. 16 at 16-18.) In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. 67 F.3d 552. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence,

29

so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

Here, after making a credibility analysis, the ALJ considered the medical evidence and opinions in the medical record. (*See* doc. 12-1 at 22-24.) He noted that Plaintiff's "extreme allegations of requiring frequent rest breaks, of needing to lie down or sit with her legs propped up, and of having 4 days a week when she can do nothing and must lie in bed all day," was inconsistent with the findings of her treatment providers, who noted "no acute distress" and only pursued conservative treatment. (*Id.* at 24.) The ALJ found that the opinions of the SAMCs were consistent with the medical evidence and gave them great weight, but, viewing matters in light most favorable to Plaintiff, "included additional limitations beyond what they proposed . . . ." (*Id.* at 24-25.) Notably, the RFC included postural limitations that limited Plaintiff's ability to climb, stoop, kneel, crouch, crawl, and balance up to 2 hours each activity per 8-hour day. (*Id.* at 21.) The ALJ expressly considered Dr. Cohen's opinion that she "should not drive a bus and that sedentary work would be better," but found it "conclusory and offered without significant support." (*Id.* at 24-25.) He noted, however, that the record showed she was unable to return to her past work as a bus driver, and that she was "limited to an amount of standing and walking . . . consistent with most reasonable understandings of [the] term [sedentary]." (*Id.*) He gave this opinion partial weight. (*Id.* at 25.) Because the RFC was based on specific medical opinions, the ALJ did not rely on his own lay

opinion in violation of *Ripley*.[27]

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 13th day of September, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[27]Even if the ALJ committed *Ripley* error, remand "is appropriate only if [Plaintiff] shows that she was prejudiced." *Ripley*, 67 F.3d at 557. Plainti has not shown that she was prejudiced in that additional evidence would have been produced that might have led to a different decision. *See id.* at n.22. Any error was therefore harmless.